UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| | ) | Case No. 08 CR 0149 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| DAVID R. CARTER, | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant David R. Carter ("Carter") has moved to suppress all fruits of a search conducted by officers of the Chicago Police Department ("CPD") on February 20, 2008 allegedly in violation of the Fourth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3). For the reasons set forth below, Carter's motion to suppress is granted in part and denied in part.

**I. BACKGROUND**

On February 20, 2008, the Chicago Community Bank at 1110 W. 35th Street in Chicago was robbed. The lone robber, a white male in his late 40s to early-to-mid 50s approached a teller in the bank, stating "Shut up. This is a bank robbery. Give me all your large bills," while reaching into his jacket as though to indicate that he possessed a pistol or other weapon. The robber took $1,050 in cash, including several pre-marked bait bills and then fled the bank on foot.

The CPD responded to the robbery, as did certain agents of the Federal Bureau of Investigation ("FBI"). After obtaining a description of the robber from bank employees, a "flash" message was sent out via the CPD radio and computer terminal networks, advising of the robbery and providing the physical description of the robber. Meanwhile,

1

officers at the scene canvassed the surrounding area. At a Chicago Food Court (the "food court") located close to the bank, employees reported that an intoxicated man had entered the food court the night before the robbery and demanded money. When one of the employees stated that she was going to call the police, the man threatened her, saying, "How about I blow all your brains out?" The man left shortly thereafter; however, the food court employees stated that the same man returned to the food court the following morning, stared at the register for a moment or two, and then left. The investigating officers believed that this individual was likely the same man who robbed the bank later that morning.

Based on the "flash" message description, CPD Officer Alfred Thome ("Thome") believed that the description of the bank robber fitted that of an individual he recalled from an incident of domestic violence occurring two weeks prior to the robbery at 937 W. 34th Street, a short distance from the bank. Thome did not recall the name "David Carter," but he had had contact with Carter from previous calls investigating alleged domestic violence incidents at that address. Thome therefore proceeded to the 34th Street address to talk to the individual he recalled.

The property at 927 W. 34th St. has three residences: a front unit facing onto the street with a back yard leading to a two-flat residential unit. Thome recalled that the location of the domestic violence call from which he remembered the suspect was on the upper floor of the two-flat unit in the back (the "apartment"). However, when Thome approached the apartment he observed a dog in the back yard of the front unit. Thome then backtracked to the front unit and spoke there with Barbara Hunter ("Hunter"), the girlfriend of the landlady's son. Thome informed Hunter that he was looking for a male

who supposedly lived in the apartment. Hunter responded that the man did not live in the apartment, but only stayed there off and on with his girlfriend. Hunter also stated that she believed that the man's girlfriend had moved out of the apartment but that he and his girlfriend occasionally returned. According to Hunter, no one was living in the apartment at that time and the owner was currently in the process of "kicking them out."

Hunter then accompanied Thome to the apartment with a set of keys but, upon arriving, found that the apartment door, although closed, was unlocked.[1] Thome noticed that there were fresh footprints in the snow that led to the door and called for an "assist car" as backup. After calling for assistance, Thome asked Hunter if she would mind if he entered the apartment. Hunter stated that she did not mind, and that she was going to call the landlady, Beverly Montgomery ("Montgomery"). Once the requested assistance arrived, Thome and other CPD officers entered the apartment, searching for any occupants. The apartment was in a state of advanced squalor, with feces on the bedroom floor and kitchen appliances missing. Thome noticed a Cook County Inmate identification card (the "identification card"), lying on a table. The identification card bore the photograph of a white male and the name "David Carter." Thome recognized the photograph as being that of the individual that he recalled from the prior domestic violence calls and whom he was seeking in the apartment.

At or about this time, Mark Alvarado ("Alvarado"), one of Montgomery's sons, arrived and identified himself as one of the owners of the property. Alvarado told Thome that Carter's girlfriend and her son were the only individuals named in the apartment's

---

[1] Thome, in his statement, states that the door to the apartment was "wide open" and that Hunter told him that it should have been locked. In her statement, Hunter contradicts Thome, stating that the door was closed, but unlocked. It is unclear whether Thome meant that the door was actually standing open or merely that it was not locked.

3

lease. He further stated that the rent had not been paid in four months and that the landlord had initiated eviction proceedings against her. Alvarado claimed that Carter and his girlfriend had recently moved out, but might still be "squatting" in the apartment. He added that Carter had been staying at the apartment from time to time and, along with various others, had received mail at that address. Recent Commonwealth Edison electrical bills addressed to Carter were also delivered to the apartment's address.

Shortly after entering the apartment and finding the card, Thome received another "flash" message via his radio with the food court employees' description of the individual who had threatened them the previous night. Thome turned the card over to two other CPD officers who eventually showed the card to the food court employees. The food court employees stated that the photograph on the identification card resembled the man who had threatened them on the evening of February 19th, and who had returned on the morning of the 20th prior to the bank robbery.

Later that day, as the investigation continued, CPD officers generated a photographic lineup, including a photograph that closely resembled, if not identical to, the photograph of Carter on the identification card. The lineup was shown to the bank teller at the bank, who stated that she was 95% sure that the photograph of Carter was also that of the robber and that she was 100% sure that none of the other individuals depicted in the lineup was the robber.

Based upon information from various sources, Carter was arrested at another apartment later that day in possession of five of the pre-marked bills. After being taken into custody and informed of his *Miranda* rights, Carter admitted robbing the bank.

Carter now claims that the warrantless search of the apartment that resulted in the

finding of the identification card violated his rights under the Fourth Amendment. Consequently, he now seeks to suppress the identification card, the identifications made by the food court employees, the identification by the bank teller from the photo lineup, and his post-arrest confession.

## II. ANALYSIS

### A. The Search of the Apartment

Under the Fourth Amendment, people have a right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's protection against unreasonable searches is manifestly a protection of the individual's privacy: in determining whether a warrantless search violates the Fourth Amendment, the court must determine: (1) whether the individual manifested a subjective expectation of privacy in the object of the challenged search; and (2) whether society is objectively willing to recognize that expectation as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Only when both the subjective and objective tests are met can the court find that a Fourth Amendment interest has been violated.

In the motion at bar, Carter argues that he had both a subjectively and objectively reasonable interest of privacy in the apartment. Carter adduces Alvarado's statement that Carter had been living at the apartment for approximately a year with the consent of the lessee (his girlfriend) and that he had been receiving mail at that address, including utility bills. Indeed, Thome's recollection of Carter was triggered by his memory of a response to at least one domestic violence call involving Carter who was then apparently living in the apartment. Carter argues that neither Hunter nor Alvarado had authority to admit

Thome to the apartment in which he claims a reasonable privacy interest, and therefore, the search of the apartment and the seizure of the card were unlawful.

The Government disagrees. According to the Government, Carter was, at best, "squatting" in the apartment; his name was not on the lease and Hunter informed him that Carter's girlfriend had apparently moved her belongings out of the apartment. The Government argues that Thome reasonably believed that no one had permission to be in the apartment and that anyone present was therefore without lawful authority to be there. Moreover, the Government continues, Thome reasonably believed that, on the facts known to him at the time, the apartment was abandoned and that Hunter had authority to admit him to it.

Police officers may conduct a warrantless search of a dwelling that they reasonably believe to be abandoned. *People v. Smith*, 561 N.E.2d 252, 256 (Ill. App. Ct. 1990). The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the property alleged to be abandoned. *Id.* at 257 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). The issue of abandonment must be decided upon the totality of the circumstances shown by the evidence.

In the instant case, Carter's girlfriend was named as the lessee on the apartment lease. Moreover, the police knew from past experience of domestic violence calls to the address that Carter lived there, at least sporadically, with his girlfriend (indeed, that knowledge was what motivated Thome to first proceed to the apartment). Carter's girlfriend was four months in arrears on the rent for the apartment, and the landlady had reportedly commenced eviction proceedings, although an eviction order had not yet been

entered. Hudson reported that she believed that Carter's girlfriend had moved her belongings out of the apartment, although she also believed that Carter and his girlfriend frequently returned. Finally, what prompted Thome to call for assistance and then enter the apartment was the presence of fresh footprints in the snow outside the apartment, indicating that someone, presumably Carter or his girlfriend, had recently used the apartment.

Since an order of eviction had not yet been entered against her, Carter's girlfriend still held a valid lease to the apartment at the time of the search. It was also evident from the fresh footprints in the snow that the apartment was recently in use. Furthermore, Carter received mail, including utility bills, at the apartment's address, indicating that he had recently resided there. The apartment was admittedly squalid, but that, in itself, is not sufficient to establish abandonment, nor is the fact that the door was closed but unlocked.

This case is therefore distinguishable from *Smith*, in which an apartment was reasonably presumed to be abandoned when the tenant, who had a month-to-month oral lease, failed to pay his rent for two months, had removed the majority of his belongings, the power was turned off, and garbage and rotting food had been left within the house. 561 N.E.2d at 258. In the instant case, Carter's girlfriend had a still-valid lease to the apartment and Carter was known to cohabit with her, meaning that Carter had at least as much of an expectation of privacy as an overnight guest in the apartment. *See Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (overnight guest has a legitimate expectation of privacy in his host's home). Thome was informed that utility bills addressed to Carter were delivered to the apartment, indicating that he received mail at that address and

possibly resided there. These facts could have permitted Thome to make the reasonable inference that Carter periodically resided in the apartment with his girlfriend's permission. Thome was further informed that Hudson believed that the girlfriend had moved her possessions out, but was also informed that Carter and his girlfriend still used the apartment; moreover, he observed evidence of recent use. Finally, Thome believed that someone, presumably Carter or his girlfriend, might be present in the apartment, or might soon arrive, and he called for backup before entering into the apartment. Given the totality of the circumstances, the court finds that Carter, who lived there at least intermittently with the lessee, had a reasonable expectation of privacy in the apartment and that Thome could not have reasonably believed that the apartment was completely abandoned. *See, e.g., U.S. v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (individual who had a key to an apartment for about a year, was afforded unrestricted access and allowed to stay overnight, and kept clothes and other items in the apartment had a legitimate expectation of privacy in the premises, even though not named on the lease).

Because the court concludes that Thome could not have reasonably believed that the apartment was abandoned, the court now turns to the issue of voluntary consent to the search. The prohibition against warrantless searches does not apply to a situation in which voluntary consent has been obtained from a third party who possesses actual or apparent common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "Common authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that

the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). The burden of establishing actual or apparent common authority rests upon the State. *Rodriguez*, 497 U.S. at 181. For the apparent authority analysis, the court must consider what the officers knew at the time they sought individual's consent and whether those facts were sufficient to demonstrate that the officers reasonably, but erroneously, believed that that the individual giving consent possessed shared authority as an occupant. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). Finally, "[w]here the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, 'warrantless entry without further inquiry is unlawful.'" *United States v. Waller*, 426 F.3d 838, 846-47 (6th Cir. 2005) (quoting *Rodriguez*, 497 U.S. at 188-89).

Facts that militate in favor of a finding of actual or apparent authority include but are not limited to: (1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at that residence; (8) performing household chores at the home; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the home when the owner is not present. *U.S. v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006) (internal citations omitted). Facts that come to light after the search began cannot reasonably influence the officers' beliefs regarding whether the consenting individual possessed apparent authority. *Id.*

9

In this case, Thome received consent to enter from Hunter, who had identified herself as the girlfriend of a son of the landlady.[2] Hunter was not the owner of the apartment, nor was she a relative, and she indicated to Thome that the owners were "in the process of kicking Carter and his girlfriend out." Of all of the factors indicating authority to consent listed above, only a single one applies (Hunter had keys to the apartment). Even if Thome could reasonably believe that Hunter, as the girlfriend of one of the co-owners, had the authority to speak as an agent of the owners, Thome could not have reasonably believed that she had authority to consent to a search of the apartment. A landlord does not have authority to permit a search of his tenant's leasehold. *Chapman v. United States*, 365 U.S. 610, 616-617 (1961); *U.S. v. Chaidez*, 919 F.2d 1193 (7th Cir. 1990). Given these circumstances, Thome could not have reasonably believed that Hunter had common authority to admit him and the officers accompanying him.

For the reasons cited above, the court finds that Carter had a reasonable expectation of privacy in the apartment and that Thorne's search of the apartment was in violation of Carter's rights under the Fourth Amendment. Because Thome's search of the apartment was unlawful, the identification card obtained during the search was unlawfully obtained and is excluded.

**B. The Food Court Employees' Identification of Carter**

The Government concedes that if the court should find that the search of the apartment was unlawful, the court should suppress the food court employees' statements that the person depicted on the identification card resembled the person who was in the

---

[2] Alvarado, one of the co-owners of the apartment, did not arrive upon the scene until after Thome had entered the apartment. His statements are therefore irrelevant as to whether Thome reasonably believed that he had received consent to search the apartment.

food court on the night of the 19th and the morning of the 20th of February.

Consequently, those statements by the food court employees are excluded.

**C. The Bank Teller's Identification of Carter from the Photo Lineup**

Carter next argues that the bank teller's identification of Carter's photograph from the photo lineup as closely resembling the bank robber should be excluded. Carter contends that the only reason that his photograph was included in the lineup was because of the seizure of the identification card during the unlawful search of the apartment. Carter argues that without the seizure of the identification card, the photo lineup would not have included Carter's image. Carter thus argues that the bank teller's identification was tainted by the unlawful search and should be excluded.

The court disagrees. For evidence to be considered fruit of an illegality, the evidence must be obtained by "exploitation" of the illegality. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence obtained by other means "sufficiently distinguishable to be purged of the primary taint" may not be considered fruit of the illegality. *Id.*; *see also Brown v. Illinois*, 422 U.S. 590, 597 (1975). In this case, Thome stated that the reason he proceeded to Carter's apartment was because he believed the description of the bank robber in the "flash" message resembled someone he recalled from a domestic violence call who lived in the neighborhood of the bank. Thome remembered the location of the domestic violence call, and would have easily been able to obtain Carter's name either from the CPD database[3]; alternatively, he could possibly have learned it from speaking to Hunter prior to the search. The Government argues, and Carter does not contest, that Carter's image was present in the records of the CPD

---

[3] The Government notes that the CLEAR database lists seven entries involving Carter at the apartment between July 2007 and mid-January 2008.

11

because of his significant criminal background. The CPD did not use the identification card in the photo lineup; rather, it used a photo similar to that on the ID card which it could have independently and lawfully obtained via its own resources. Thome's recollection of the location where an individual fitting the robber's description lived could clearly have yielded Carter's identity and photograph without the need to enter the apartment.

According to the U.S. Supreme Court, "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Murray v. United States*, 487 U.S. 533, 537 (1988); *Nix v. Williams*, 467 U.S. 431, 443 (1984). Excluding evidence that the police ultimately or inevitably would have discovered by lawful means would not put the police in the same position they would have been in if they had not committed any illegal conduct; instead, it would put them in a worse position. *Nix*, 467 U.S. at 444; *see also U.S. v. Jones*, 72 F.3d 1324, 1329 (7th Cir. 1995). The inevitable discovery exception to the exclusionary rule avoids this by allowing the introduction of evidence discovered initially during an unlawful search if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. *Nix*, 467 U.S. at 444.

In the instant case, Thome initially obtained Carter's likeness and name on the identification card as the result of the tainted search of the apartment. Therefore, the identification card itself is tainted and is subject to exclusion. However, Thome would

have inevitably discovered Carter's name and photograph from the police records and database information, based upon his personal knowledge of Carter from his prior dealings with him. Thome knew the individual for whom he was looking and did not therefore require the tainted identification card. Carter's name and photograph would have thus inevitably been lawfully obtained from an independent source (the police records and database) without necessarily relying on the evidence obtained from the unlawful search of the apartment. Or in other words, even had the tainted search never occurred, Thome would still have had the knowledge and means to lawfully obtain Carter's name and photograph from the police records and databases.

Therefore, the use of Carter's photograph in the photo lineup was not an exploitation of the unlawful search, but could have taken place independently even if the unlawful search had not occurred. The bank teller's identification of Carter from the photo lineup is therefore sufficiently attenuated from the unlawful search, and Carter's motion to suppress it is consequently denied.

**D. Carter's Post-Arrest Statements**

Finally, Carter moves to suppress his voluntary confession given sometime after he was arrested and informed of his *Miranda* rights. Carter argues that the bank teller's identification of him as greatly resembling the bank robber was a direct result of the unlawful search and seizure of the identification card, and that without it the CPD and FBI would not have known Carter's name. That identification, contends Carter, is what led to his arrest, and therefore all of the subsequent information, including Carter's inculpatory statements, are "fruit of the poisonous tree" and should be excluded.

13

The court has already discussed why the bank teller's identification of Carter from the photo lineup was sufficiently attenuated from the tainted search to preclude its suppression. The chain between the unlawful search and the bank teller's identification of Carter from the photo lineup was therefore broken. Carter's arrest and his voluntary confession are likewise free of the taint of the unlawful search and Carter's motion to suppress his confession is denied.

### III. CONCLUSION

For the reasons set forth above, Carter's motion to suppress the identification card seized in the search of the apartment and the food court employees' statements that Carter's photograph depicted on the identification card resembled the man who had visited the food court on the evening preceding and the morning of the bank robbery is granted. Carter's motion to suppress the bank teller's identification of his likeness from the photo lineup and his post-arrest inculpatory statements is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 12, 2008