## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 08 CR 149 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| DAVID R. CARTER | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant David R. Carter was arrested on suspicion of robbery of the Chicago Community Bank at 1110 W. 35th Street on February 20, 2008. Carter moved to suppress evidence resulting from the search of his apartment, his identification by employees of a neighboring food court, his identification by a bank teller working at the Chicago Community Bank, and his arrest, post-arrest statements, and the search of the residence where he was arrested, under the theory that the original search of his apartment had been unlawful and the subsequently discovered evidence was an illegal fruit of this first search. Via order dated August 12, 2008, the court found that Carter's Fourth Amendment rights had been violated during the search of the apartment, and suppressed evidence seized therein and the subsequent identification of Carter at the food court. *United States v. Carter*, No. 08 CR 149, 2008 WL 4874473, at *3–6 (N.D. Ill. Aug. 12, 2008). However, the court declined to suppress the other evidence because, although that evidence did result from the initial illegal search, the court concluded that it would have been inevitably discovered. *Id.* at *6–8.

Carter moved for reconsideration of the "inevitable discovery" portion of the August 12, 2008 Order. Carter's motion to reconsider is granted. On December 11, 2008, a hearing on this issue was held.[1] For the reasons stated below, Carter's motion to suppress is granted.

## BACKGROUND[2]

On February 20, 2008, at about 9:10 a.m., the Chicago Community Bank at 1110 W. 35th Street in Chicago was robbed. The lone robber, a white male in his late 40s to early-to-mid 50s, approached a teller in the bank, demanded money and stated that this was a robbery, and reached into his jacket as though to indicate that he possessed a pistol or other weapon. The robber took $1,050 in cash, including several pre-marked bait bills, and then fled the bank on foot.

The Chicago Police Department ("CPD") and the Federal Bureau of Investigation ("FBI") responded to the robbery. After obtaining a description of the robber from bank employees, a "flash" message was sent out via the CPD radio and computer terminal networks, advising of the robbery and providing the physical description of the robber. Officers canvassed the surrounding area. At a Chicago Food Court (the "food court") located close to the bank, employees reported that an intoxicated man had entered the food court the night before the robbery and demanded money. When one of the employees stated that she was going to call the police, the man threatened her, saying, "How about I blow all your brains out?" The man left shortly thereafter; however, the food court employees stated that the same man returned to the food court the following morning, stared

---

[1] On January 8, 2009, the government supplemented its filing to emphasize that it was relying primarily on the attenuation theory articulated in *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997), and *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990), and only secondarily on the "inevitable discovery" theory. Both theories are addressed herein.

[2] This factual recitation is limited to those facts germane to the issues of attenuation and inevitability. Facts relevant to the illegality of the original apartment search and the food court identification are provided in the August 12, 2008 Order. *United States v. Carter*, No. 08 CR 149, 2008 WL 4874473, at *3–6 (N.D. Ill. Aug. 12, 2008).

at the register for a moment or two, and then left. The investigating officers came to believe at some period after beginning to investigate the bank robbery that this individual was likely the same man who robbed the bank later that morning.

Based on the "flash" message description, CPD Officer Alfred Thome ("Thome") believed that the description of the bank robber fitted that of an individual he recalled from a domestic violence incident occurring approximately two or three weeks prior to the robbery at 937 W. 34th Street, a short distance from the bank.[3] David Carter resided off and on with his girlfriend at the 937 W. 34th Street residence. Thome did not know the name "David Carter," but had a "hunch" from the "flash" that the bank robber and the man Thome had seen at the 937 W. 34th Street residence could be the same person. At approximately 10:50 a.m., Thome proceeded to the 34th Street address to see if he could locate and talk to the individual he remembered from the earlier incident.

The property at 927 W. 34th Street has three residences: a front unit facing onto the street with a back yard leading to a two-flat residential unit. Carter's unit was on the upper floor of the two-flat unit in the back (the "apartment"). Prior to entering the apartment, Thome spoke to Barbara Hunter. Hunter resided in the front building and was a girlfriend of the son of the landlord. Hunter escorted Thome to the apartment, but did not enter the apartment.

Thome entered the apartment, and while he was there he located a Cook County Inmate identification card (the "Cook County ID card" or "ID card"). The ID card bore the photograph of a white male and the name "David Carter." Thome recognized the photograph as being that of the individual he recalled from the prior domestic violence call, and whom he was seeking in the

---

[3] No police report related to this domestic violence event was prepared.

apartment. Thome testified that he first learned of the name "David Carter" upon seeing the Cook County ID card.[4]

Around this same time, Thome received another "flash" message with the food court employees' description of the individual who had threatened them the previous night. Thome turned the ID card over to two other CPD officers who took it to the food court. The Cook County ID card was shown to food court employees, who stated that the photograph on the ID card resembled the man who had threatened them on the evening of February 19th, and who had returned on the morning of the 20th prior to the bank robbery. It is unclear exactly when this identification occurred, but the Cook County ID card was promptly returned to Thome at or in front of the apartment.

Special Agent Burke was the case agent for the FBI on this case. Burke was located at the bank during the morning, but sometime prior to noon he relocated to the apartment. It is unclear what prompted Burke to go to the apartment, but he went there only after Thome had located the Cook County ID card. Thome gave Burke the Cook County ID card shortly after Burke arrived at the apartment. Burke interviewed Mark Alvarado, who had previously spoken to Thome and who was an owner of the property and resident of the first-floor apartment below the Carter apartment. It is unclear whether Burke first spoke to Alvarado or first obtained the Cook County ID card, but the investigation was clearly focusing on Carter at this point, and the FBI statement summarizing

---

[4] An FBI summary of a phone interview of Hunter conducted on July 9, 2008, nearly five months after the incident, contradicts Thome on this point; Hunter stated that Thome mentioned the name David Carter prior to Thome's entry into the apartment. *See* Hunter Stmt. (Def.'s Reply to Gov'ts' Resp. to Mot. to Suppress, Ex. C (Doc. No. 23)). Given that Hunter did not testify, that both parties argued from the basis that Thome did not know the name David Carter until he obtained the Cook County ID card, that Thome has first-hand knowledge of his own mental state, and that it is ultimately the government's burden to show that the remaining evidence was lawfully obtained, the court credits Thome's version of events.

the Alvarado interview states that Alvarado "confirmed" that Carter was living in the apartment. *See* Alvarado Stmt. (attached as Ex. D to Def. Mot. to Suppress Evid. (Doc. No. 15)). At the end of the interview Alvarado supplied Burke with a list of nine names of individuals who had recently received mail at the apartment. David Carter's name was on the list.

At about noon, Burke left the apartment and went to the Ninth District police station. He utilized the "CLEAR Database," a database that allows law enforcement officers to look up information about both people and addresses, to locate a recent photograph of David Carter. Burke searched within CLEAR by first entering the name "David Carter," which generated about 65 hits. Burke then selected the information specific to the David Carter who resided at 927 W. 34th Street. Burke did not do any other searches within CLEAR at that time, either with other names from the list given to him by Alvarado, or by searching just for the 927 W. 34th Street address and seeing what names might be produced. After locating Carter in CLEAR, Burke proceeded to generate a "photo lineup" using a photo of Carter located within CLEAR. From the time Burke left the apartment to the time a photo lineup was generated, approximately 45 minutes elapsed.

By about 1:00 p.m., Burke took the photo lineup to the residence of the eye-witness bank teller. The bank teller identified the photograph of David Carter as the person who had robbed the bank that morning.

Now armed with a photograph and eye-witness identification, the CPD hit the streets to find Carter. It did not take them long. Through street informants the CPD quickly located Carter at a different residence in the neighborhood. At about 4:45 p.m. the CPD officers knocked on the door of the residence and were given permission to enter by the person who opened the door.[5] The CPD

---

[5] The timing, and identity of the person giving consent to enter, comes from the stipulation of CPD Officer Anthony Corral, which was stipulated to at the end of the December 11, 2008 hearing. *See* Corral Stip. (Doc. No. 40). The precise details of what occurred at the residence where

5

officers located and arrested Carter, and in the process found additional evidence, including the bait bills from the bank.

Carter was processed and at 6:56 p.m. he signed a *Miranda* waiver. He gave an oral statement shortly thereafter, purportedly admitting to the robbery.

**ANALYSIS**

The court has already concluded that the original search of the apartment and seizure of the Cook County ID card by Thome, and the ensuing identification at the food court, were improper in its August 12, 2008 Order. The court must herein examine whether the photo lineup identification by the bank teller is sufficiently attenuated and/or would have been inevitably discovered, and if not, whether Carter's arrest and the resulting search are sufficiently attenuated and/or would have inevitably occurred.

**I.      Legal Standards**

The illegal search of Carter's apartment was the "but for" cause of all the evidence Carter now seeks to suppress, but as the Supreme Court instructed in *Wong Sun v. United States*, 371 U.S. 471 (1963), suppression does not result simply because the evidence "would not have come to light but for the illegal actions of the police." *Id.* at 487–88. "Even in situations where the exclusionary rule is plainly applicable, [the Supreme Court has] declined to adopt a 'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997) (quoting *United States v. Ceccolini*, 435 U.S. 268, 276 (1978)). "Rather, the more apt question in such a case is whether, granting establishment of the primary

---

Carter was arrested are not clear, but Carter does not contest that consent to enter was properly given.

illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun*, 371 U.S. at 488) (internal quotations omitted).

There are two relevant methods whereby the evidence in question could be admitted. The first is under the theory of attenuation. To determine whether the taint has been sufficiently attenuated, three factors are generally considered: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Green*, 111 F.3d at 521 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). "In the final analysis, however, the question is still whether the evidence came from 'the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun*, 371 U.S. at 488).

The second theory that could save the government's evidence is that of inevitable discovery. This theory is typically utilized only in the context of searches that were illegally conducted because no search warrant had previously been obtained; as the Seventh Circuit explained in *United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008), such a failing will be overlooked only if the police can "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." *Id.* at 813. There is no indication in the present case that the CPD or FBI ever attempted to secure a search warrant for any of the evidence in question, nor any indication that such a warrant would have issued had it been sought. However, this doctrine was initially derived, like the attenuation theory, from *Wong Sun*; if the "the evidence inevitably would have been gained even without the unlawful search," then the exclusionary rule will not apply. *United States ex rel. Owens*

*v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974).[6]  This theory also appears to be potentially at issue in this case, though it will be applied only if it appears inevitable, or certain, that the evidence would have been discovered had the illegality never occurred.

The government bears the burden of showing that the evidence is admissible.  *Taylor v. Alabama*, 457 U.S. 687, 690 (1982).

**II.    Timing of Events**

The first factor to consider under the attenuation theory is the amount of time that elapsed between the illegal conduct and the subsequent discovery of the evidence at issue.  *Green*, 111 F.3d at 521.  The robbery occurred at around 9:10 a.m.  The FBI and CPD moved very quickly in this case, starting first with a "flash" message (about 9:30 a.m.), to the illegal search of the apartment and seizure of the Cook County ID card (about 10:50 a.m.), to the illegal food court identification (between 11:00 a.m. and 12:00 p.m.), to Agent Burke's arrival at the apartment and receipt of the ID card (before 12:00 p.m.), to the photo lineup being generated (about 12:45 p.m.), to the photo lineup identification by the bank teller (about 1:00 p.m.), to Carter's discovery and arrest (about 4:45 p.m.), to Carter's statement being taken (about 7:00 p.m.).  By any standard, this was a fast operation, especially the sequence between obtaining the Cook County ID card and the photo identification by the bank teller (about two hours), and between the arrest and alleged confession (about two hours).  *See Taylor*, 457 U.S. at 691 (confession following illegal arrest by six hours not sufficiently attenuated).  However, the time frame it is only one factor to consider, and is never dispositive.  *Green*, 111 F.3d at 521.

---

[6] *Owens* identifies a third theory: that the evidence was discovered by an independent source. 508 F.2d at 865.  The independent source theory was not raised by the government and is not at issue, except to the extent that it is implicated in the intervening circumstances element of the attenuation theory.

8

## III. Intervening Circumstances

### A. Photo Lineup Identification

"The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal [activity] and the discovery of the evidence." *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003) (citing *Wong Sun*, 371 U.S. at 491). The government argues that although the original search of the apartment and subsequent identification at the food court were deemed illegal, the photo lineup identification by the bank teller is admissible because the teller's actions constitute an intervening event that wiped clean the taint of the prior illegal acts. This argument is incorrect as it fails to acknowledge key steps of the chronology leading up to the teller identification.

There is no suggestion that the bank teller *herself* was tainted by the prior illegal police conduct. However, the teller's role does not save the photo lineup identification, for the predicate to the identification was the creation of the photo lineup. If the photo lineup would not have come into being absent the illegal activity, then the subsequent identification by the bank teller must be suppressed—not because the bank teller did anything improper, but because the creation of the photo lineup was a direct result of the illegal activity. *See United States v. Crews*, 445 U.S. 463, 472 (1980) (suppressing out of court identification because photograph became available only after illegal arrest, but still permitting subsequent *in-court* identification by victim if victim's in-court identification was based on personal recollection); *United States v. Foppe*, 993 F.2d 1444, 1448, 1451 (9th Cir. 1993) (suppression of out of court photospread); *United States v. Edmons*, 432 F.2d 577, 584 (2d Cir. 1970) ("[W]here flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.").

Burke focused on David Carter as a result of Thome's illegal search of the apartment (given Thome's insistence that the name was only learned after the illegal search). Burke also spoke to Alvarado, and at the end of their interview Alvarado provided Burke with a list of names associated with the apartment, including "David Carter," but this can hardly be considered an intervening event. Witness identifications can often constitute intervening events, but only where the information is not tainted by the original illegality. *See United States v. Ceccolini*, 435 U.S. 268, 276–80 (1978). Alvarado identified the name "David Carter" only *after* Burke had asked him about Carter, and he came out to speak to the police only after hearing noises in the apartment above him—that is, in response to the illegal search. Burke's conversation with Alvarado occurred at about the same time as or after the food court identification, for the ID card had to be returned from the food court to the apartment before it could be handed by Thome to Burke, and Burke testified that he was given the ID card at about the same time that he interviewed Alvarado.[7] Alvarado's actions were not an intervening event; they were a response to the illegal activity, and merely confirmed what Burke had already learned from Thome.

Nor was Burke's reliance on the CLEAR database sufficiently separated from the illegal search. Burke was focusing on Carter because of Thome's discovery of the Cook County ID card. No other basis for Burke's knowledge of the name has been proffered. When Burke created the photo lineup in the CLEAR database, he focused exclusively on the "David Carter" associated with 937 W. 34th Street. Burke did not check any of the other names provided to him by Alvarado, nor

---

[7] Burke's testimony on the exact timing of events at the apartment lacks precision. Burke testified that he was given the Cook County ID card and spoke to Alvarado within a period of ten to fifteen minutes, but Burke was uncertain as to which event occurred first.

did he examine other people associated with the 937 W. 34th Street address in CLEAR.[8]  Although the CLEAR database did contain a photograph of Carter that was different from that of the Cook County ID card (and the CLEAR database photograph was the one ultimately used in the photo lineup), this is not the relevant inquiry.  The question is why Burke was focusing on Carter, and whether any intervening act occurred that would have also implicated Carter.  From this chronology, the court can conclude only that Burke did not search for other individuals associated with the address because he was relying on Thome's identification and the fact that Carter had already been identified by the food court employees earlier in the day.[9]  The speed and accuracy of the CLEAR query was a direct result of Thome's seizure of the Cook County ID card.  No intervening circumstance produced this result.

Because of the foregoing, the bank teller's out of court identification must be suppressed. To be clear, the bank teller did nothing improper, but the lack of any intervening event to sever the causal connection between the illegal search and the photo lineup means that suppression must be ordered.[10]

---

[8] Burke could not testify as to how many names such a query would produce.  He stated that he did run the query once, but only after Carter had been arrested, and he could not estimate how many names linked to the address had been found.

[9] Burke did not verify that the CLEAR database picture of Carter matched Thome's memory; the obvious reason is that Burke recalled Carter's picture from the Cook County ID card, which looks almost identical to the picture from the CLEAR database.

[10] The Supreme Court's analysis in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) does not suggest to the contrary.  In *Lopez-Mendoza*, the Court stated that "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039.  Some courts have suggested that this section of *Lopez-Mendoza* applies to evidentiary challenges.  *See United States v. Ortiz-Hernandez*, 441 F.3d 1061, 1063 (9th Cir. 2006) (Paez., J., dissenting from denial of rehearing *en banc*).  This court disagrees with such a broad interpretation of *Lopez-Mendoza*.  As articulated in *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006) and *United States v. Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001), the "body or identity"

B. Search and Seizure Attendant to Carter's Arrest

When the CPD located Carter, the owner of the residence gave consent to enter and to search the residence, and the CPD found inculpatory evidence, including the bait bills. The admissibility of this evidence depends on the admissibility of the bank teller identification, or something else that would provide an intervening basis for the CPD's and FBI's interest in Carter as a suspect. No alternate basis has been suggested. Without the illegal search, food court identification, and bank teller identification, there would have been no reason for the CPD to have searched for Carter, or gone to the residence where he was ultimately found. The search incidental to Carter's arrest was a direct result of the previous unlawful actions by the CPD.[11]

---

statement refers only to jurisdictional challenges, such as whether an immigration court or a criminal court can prosecute somebody who has been illegally arrested. *See Olivares-Rangel*, 458 F.3d at 1110 (citing *Guevara-Martinez*, 262 F.3d at 754).

Regardless of the precise meaning of this phrase from *Lopez-Mendoza*, the case is inapplicable for another reason. Here, the illegal search was focused on identifying Carter, and was not directed at some other objective. In contexts such as this, it is appropriate to suppress the resulting identity evidence. *See United States v. Garcia-Beltran*, 443 F.3d 1126, 1133 (9th Cir. 2006) (noting that "the suppression of initial fingerprints [is] dependent upon the purpose for which the fingerprints are taken following an illegal arrest."); *Olivares-Rangel*, 458 F.3d at 1111 (noting that fingerprint evidence may be suppressed if purpose of search was to obtain the fingerprints);. Guevara-Martinez, 262 F.3d at 755 (applying exclusionary rule to identity evidence "whenever evidence has been obtained 'by exploitation' of the primary illegality").

[11] In limited circumstances, "the admission of evidence obtained during consensual searches following illegal seizures" can be sufficiently voluntary so as to constitute an intervening event. *Green*, 111 F.3d at 521. However this observation is inapposite given that the CPD never would have sought consent but for the prior illegal searches and identifications that had occurred. The three cases cited by *Green* make this clear. The first case is *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988), which states that for a voluntary act to be attenuated after a Fourth Amendment violation, the act must be "voluntary in fact." *Id.* at 520. To decide if something is "voluntary in fact," the *Guzman* utilizes the same three factors articulated in *Green*—temporal proximity, intervening circumstances, and purpose and flagrancy. *Id.* Because no intervening circumstance exists here, the test articulated in *Guzman* is not satisfied. *Green* also cites *United States v. Chavez-Villarreal*, 3 F.3d 124 (5th Cir. 1993), which reiterates the *Guzman* inquiry. *Id.* at 127–28. Finally, *Green* cites *United States v. Thompson*, 106 F.3d 794 (7th Cir. 1997). *Thompson* did not involve any illegality, for the court concluded that consent to search was proper, and that there was

12

Because of the direct nexus between the illegal search and identifications and the subsequent arrest of Carter, the consensual search by the owner of the residence where Carter was found is not sufficient to wipe away the taint of the prior illegal acts.

C.     Carter's Post-Arrest Statements

Just a little over two hours after Carter was arrested, he was read his *Miranda* rights, signed a form stating that he understood the same, and gave an oral inculpatory statement. Carter seeks to have this statement suppressed as a fruit of the poisonous tree

The *Miranda* warnings given to Carter do not make the subsequent statement so independent that a finding of attenuation is appropriate. *Reed*, 349 F.3d at 464 ("*Miranda* warnings by themselves do not suffice to purge the taint of an illegal arrest."). The present inquiry involves Carter's Fourth Amendment rights, which implicate separate interests and policies than those protected by the Fifth Amendment and *Miranda*. *Id.* (citing *Taylor*, 457 U.S. at 690–91). Both *Reed* and *Taylor* are controlling on this issue, assuming as the court does that no proper identification or other evidence that established probable cause was obtained which could separately have justified the arrest. In *Taylor*, the Supreme Court made clear that a six-hour delay between arrest and confession was insufficient. 457 U.S. at 691. In *Reed*, an inculpatory statement was taken approximately five hours after his arrest, and after Reed had had "solitary down time" to reflect on the "kind of trouble he might be in." 349 F.3d at 462. None of this was deemed sufficiently intervening  so as to justify a finding of attenuation. *Id.* at 464.

The facts are clearer here. There is no allegation that Carter was treated improperly or otherwise coerced after being taken into custody, but there is also no evidence of any intervening event that might have prompted Carter to confess voluntarily. The admissibility of this statement,

---

no seizure prior to the consent being given. *Id.* at 797–98.

13

like the admissibility of the evidence found in the residence where Carter was located, is inextricably linked to the illegal bank teller identification.

## IV. Purpose and Flagrancy of the Violations

The court must finally consider the purpose and flagrancy of the official misconduct. *Green*, 111 F.3d at 521. "This factor 'is tied to the rationale of the exclusionary rule itself,' '[which is] calculated to prevent, not repair. Its purpose is to deter.'" *Id.* (quoting *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990); *Brown*, 422 U.S. at 600). Erroneous conduct alone is insufficient to invoke this rule; the action must have been "undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *Id.* (quoting *Fazio*, 914 F.2d at 958). In part, this inquiry should include "whether the actions were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to . . . other useful evidence." *Reed*, 349 F.3d at 465. Finally, "'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner . . . ." *Id.* The focus is on the "quality of purposefulness," and, of course, what that purpose was. *Id.*

In this case, every activity was undertaken in an effort to develop the evidence against Carter. There was no purpose other than to confirm Carter's name, and to confirm if Carter was the suspect in question. *Contra Green*, 111 F.3d at 523 (noting that unlawful stop of Green was undertaken not to obtain evidence against Green, but to obtain evidence against another individual). There is no suggestion of coerciveness, but that is not the issue—the Fourth Amendment violations that occurred at both the time of the seizure the ID card and the identification at the food court should have been patently obvious to all involved.[12]

---

[12] The record does not disclose whether Burke was aware that Thome's search and seizure was illegal; nevertheless, everything Burke did was directly dependent on, and thus exploited, Thome's illegal search. The Supreme Court recently noted in *Herring v. United States*, 129 S. Ct.

14

"In the final analysis . . . the question is still whether the evidence came from 'the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* at 521 (quoting *Wong Sun*, 371 U.S. at 488). No doubt the officers desired to act quickly to arrest a suspected robber before he disappeared or committed another crime, and the officers seized upon the impermissible fruit and ran with it. No sufficiently distinguishable source of momentum altered the trajectory of the officers' activities. Given both the short period of time, the direct connection to the original illegal search, and the clear purpose of the illegality, the attenuation theory does not protect: (1) the out of court identification by the bank teller; (2) evidence seized during Carter's arrest and ensuing search; or (3) Carter's post-arrest statement.

V.    **Inevitability of Discovery**

The question of inevitability still remains. There can be no doubt that the CPD and FBI could have eventually discovered the name "David Carter" if Thome had pursued his hunch without the benefit of the illegal search and seizure. Thome testified that he can call in to his radio dispatcher to request aliases associated with addresses from the CLEAR database, and that he has done this in the past. However, no government witness could state how many aliases were associated with this specific address. Thome remembers Carter from a domestic violence event that Thome states occurred about two or three weeks before the illegal search, but that particular event presumably does not appear in the CLEAR database because no report was ever written about it. While the government has shown that Carter is listed in CLEAR as having had domestic violence

---

695 (2009) that when one police department acts negligently and another police department relies, in good faith, on the negligence of the other, the exclusionary rule may not apply. *Id.* at 703. However, where the illegal or improper actions were done recklessly or knowingly, then the subsequent officer's (innocent) reliance on these mistakes does not eviscerate the deterrent effect, and exclusion is still appropriate. *Id.* at 703–04. Here, Thome's actions were objectively unreasonable, and exclusion remains an appropriate remedy.

arrests in the past, no corresponding information has been provided regarding whether other names associated with that address also have domestic violence histories. Thome hypothetically could have returned to the precinct and looked himself at the pictures of any individuals associated with the address who had domestic violence events, and thereby confirmed that Carter was the individual he remembered. However, Thome testified that although he knew that the CLEAR database had this functionality, he had *never* run such a search himself in his 38 years of service.

Finally, Thome noted that he was not assigned to work on this case. He responded to the "flash" messages (as did presumably nearly every officer in the area). Thome did nothing further with this case after the search of the apartment was completed, and there is no reason to believe that, had he gone to the apartment, not found the person he remembered, and not illegally entered, he would have done anything further in connection with this investigation. Viewing these facts in their totality, it cannot be stated with any degree of confidence that, without his illegal search and seizure, Thome would have eventually obtained the name David Carter. And even if he had, it is doubtful that he would have obtained a photograph to show to the food court employees. Without that illegally obtained evidence, it is not inevitable that Carter would have become the focus of the investigation.

The theory of inevitable discovery does not protect: (1) the out of court identification by the bank teller; (2) evidence seized during Carter's arrest and ensuing search; or (3) Carter's post-arrest statement.

16

## CONCLUSION

The following evidence is suppressed: (1) the out of court identification by the bank teller; (2) evidence seized during Carter's arrest and ensuing search, and (3) Carter's post-arrest statement.

                          ENTER:

                          /s/
                        JOAN B. GOTTSCHALL
                        United States District Judge

DATED: February 6, 2009